AO 91 (REV.5/85) Criminal Complaint

AUSA  Jeffrey  Cramer (312) 886-7631

# UNITED STATES DISTRICT COURT

__NORTHERN__ DISTRICT OF __ILLINOIS, EASTERN DIVISION__

UNITED STATES OF AMERICA

V.

BELINDA JOHNSON
728 West 138th Street, First Floor
Riverdale, IL 60827

FILED
OCT 01 2002
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**CRIMINAL COMPLAINT**

**MAGISTRATE JUDGE KEYS**

CASE NUMBER:

# 02CR0948

DOCKET
OCT 04 200

I, the undersigned complainant being duly sworn state the following is true and correct

to the best of my knowledge and belief.  On or about August 9, 1998 to April 25, 2002, in

Cook County and elsewhere, in the __Northern__ District of __Illinois__ defendant(s)

did, (Track Statutory Language of Offense)

> knowingly and with intent to defraud produce, use, traffics in one or more counterfeit
> access devices, and the offense affects interstate commerce

in violation of Title __18__ United States Code, Section __1029(a)(1)__ .

I further state that I am a(n) __Special Agent__ and that this complaint is based on the
        Official Title

following facts:

SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof:  _X_ Yes  ___ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

October 1, 2002
Date

at  Chicago, Illinois
   City and State

Arlander Keys
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

STATE OF ILLINOIS       )
                        ) S. S.
COUNTY OF COOK          )

## AFFIDAVIT

I, SCOTT A. HESTON being duly sworn on oath, state as follows:

1.   I am a Special Agent with the Secret Service, and am assigned to the Financial Crimes Unit.  I have been employed by the Secret Service for approximately 2 1//2 years.  My responsibilities as a Special Agent include the investigation of credit card and check fraud.

2.   The information contained in this affidavit is based on my first-hand knowledge and upon information supplied by other federal agents, law enforcement officers, and witnesses.  The loss figure represented in this affidavit for the five suspects is approximately $600,000.

3.   The information contained in this affidavit is submitted for the limited purpose of establishing probable cause in connection with the complaint and application for search warrant to which this affidavit is attached.  I have set forth only facts that I believe are necessary to establish probable cause in this matter.  This is not a complete statement of all that I know about the defendant or the events described in this affidavit.

4.   This affidavit is made in support of a Search Warrant of four premises : 1) 728 W. 138th Street, First Floor, Riverdale, IL; 2)  728 W. 138th Street, Second Floor, Riverdale, IL.; 3)8552 S. Kingston, Chicago, IL.; and 4) 705 East 78th Street, Apt. 2W Chicago, IL.

1

5.      According to Kylee Evans, the Regional Investigator for Target Corporation, which is the parent company for Marshall Fields and Target, when a customer presents a bank check to pay for merchandise, the cashier will verify the bank routing number on the check by placing the check in a scanner. The scanner will confirm the legitimacy of the bank routing number.

6. According to Kylee Evans, the customer presenting the check must also verify his/her identification before the check will be accepted for payment.

7.      The information from Kylee Evans below is based upon her review of the surveillance videos at the specific stores and/or the various checks and pieces of identification presented by the suspects. The identifications of the suspects' real names were based upon law enforcement's review of the surveillance videos at the stores and/or the various checks and pieces of identification presented by the suspects.

8.      According to Kylee Evans, BELINDA JOHNSON purchased merchandise at the following stores using the following false names and addresses:

A.  On or about September 22, 1999, BELINDA JOHNSON purchased $298.88 worth of merchandise from Target, 1951 W. Jefferson Avenue, Naperville, Illinois by submitting false identification in the name of Amy Wegren, 4320 Linton Avenue, #2, St. Louis, Missouri and paying by a fraudulent check. The check was fraudulent in that the bank routing number was accurate but the checking account number was not a real account.

B.  On or about January 13, 2000, BELINDA JOHNSON purchased $279.29 worth of merchandise from Target, 2621 W. Schaumburg, Schaumburg, Illinois

2

by submitting false identification in the name of Diana Chase, 4248 Washington Street, Gary, Indiana and paying with a fraudulent check. The check was fraudulent that the bank routing number was accurate but the checking account number was not a real account.

C. On or about March 6, 2000, BELINDA JOHNSON purchased $286.26 worth of merchandise from Target, 2621 W. Schaumburg, Schaumburg, Illinois by submitting false identification in the name of Claudia Ephraim, 1102 N. Jackson St., Milwaukee, Wisconsin and paying with a fraudulent check. The check was fraudulent in that the bank routing number was accurate but the checking account number was not a real account.

D. On or about June 18, 2001, BELINDA JOHNSON purchased $266.36 worth of merchandise from Marshall Field's, 1 Louis Joliet Mall, Joliet, Illinois by submitting false identification in the name of Lally Ulery, 6210 Delaware Avenue, Merrillville, Indiana and paying with a fraudulent check. The check was fraudulent in that the bank routing number was accurate but the checking account number was not a real account.

E. On or about December 1, 2001, BELINDA JOHNSON purchased $452.55 worth of merchandise from Marshall Field's, 1555 Northbrook Ct., Northbrook, Illinois by submitting false identification in the name of Laura Geary, 9119 Bradenton Road, Ft. Wayne, Indiana and paying with a fraudulent check. The check was fraudulent in that the bank routing number was accurate but the checking account number was not a real account.

9. According to Kylee Evans, from approximately August 9, 1998 until and including April 25, 2002, BELINDA JOHNSON has purchased over $31,000 worth of merchandise from Marshall Fields and Target stores in eight (8) states, including Illinois, using false names, identifications, and paying with fraudulent checks in that the bank routing number was accurate but the checking account number was not a real account.

10. According to Kylee Evans, Telecheck Check Services ("Telecheck") and Certegy, Inc. were check insurance companies. Telecheck and Certegy guaranteed the validity of checks that its customer retail stores submitted for review. The retail stores requested the assurance of checks presented to the store by a customers purchasing goods prior to completing the sale.

11. According to company representatives, Telecheck and Certegy acted as check insurance companies for several commercial establishments including American Eagle Outfitters, J. Crew, Bebe Stores, Nextel, and Harrah's Joliet Casino.

12. Once the retail store received an assurance from Telecheck or Certegy, those check insurance companies would be required, under a contract with the retail stores, to pay the amount of the check if the check was returned for insufficient funds or any other reason.

13. According to company records, Telecheck and Certegy have paid over $40,000 due to fraudulent checks written by BELINDA JOHNSON using false names, identifications, and paying with fraudulent checks in that the bank routing number was accurate but the checking account number was not a real account.

14. According to Kylee Evans, SHIKILA BLOUNT purchased merchandise at the following stores using the following false names and addresses:

A. On or about July 17, 1999, SHIKILA BLOUNT purchased $184.01 worth of merchandise from Target, 2621 W. Schaumburg, Schaumburg, Illinois by submitting false identification in the name of Monique Shaw, 5930 S.Normal, Chicago, Illinois and paying by a fraudulent check. The check was fraudulent in that the bank routing number was accurate but the checking account number was not a real account.

B. On or about November 9, 1999, SHIKILA BLOUNT purchased $277.10 worth of merchandise from Target. 2621 W. Schaumburg, Schaumburg, Illinois by submitting false identification in the name of Latouya James, #329 4 Courts East, Carmel, Inidiana and paying with a fraudulent check. The check was fraudulent in that the bank routing number was accurate but the checking account number was not a real account.

C. On or about May 20, 2000, SHIKILA BLOUNT purchased $300.00 worth of merchandise from Target, 21600 S. Cicero Avenue, Matteson, Illinois by submitting false identification in the name of Nattay Griffin, 5710 Hohman Avenue, Hammond, Indiana and paying with a fraudulent check. The check was fraudulent in that the bank routing number was accurate but the checking account number was not a real account.

D. On or about January 6, 2002, SHIKILA BLOUNT purchased $285.78 worth of merchandise from Marshall Field's, 1 Woodfield Mall, Schaumburg, Illinois by submitting false identification in the name of Kara Hamelly, 3330 N. Cambridge Avenue, Milwaukee, Wisconsin and paying with a fraudulent check. The check was fraudulent in

that the bank routing number was accurate but the checking account number was not a real account.

15. According to Kylee Evans, from approximately July 8, 1999 until and including March 1, 2002, SHIKILA BLOUNT has purchased over $15,000 worth of merchandise from Marshall Fields stores in seven (7) states, including Illinois, using false names, identifications, and paying with fraudulent checks in that the bank routing number was accurate but the checking account number was not a real account.

16. According to company records, Telecheck and Certegy have paid over $53,000 due to fraudulent checks written by SHIKILA BLOUNT using false names, identifications, and paying with fraudulent checks in that the bank routing number was accurate but the checking account number was not a real account.

17. According to Kylee Evans, ROBIN HATCHETT purchased merchandise at the following stores using the following false names and addresses:

A. On or about November 6, 1999, ROBIN HATCHETT purchased $203.18 worth of merchandise from Marshall Fields, 1000 Spring Hill Dr., West Dundee, Illinois by submitting false identification in the name of Lashanda Posey, 118 Medical Drive, Carmel, Indiana and paying by a fraudulent check. The check was fraudulent in that the bank routing number was accurate but the checking account number was not a real account.

B. On or about November 7, 1999, ROBIN HATCHETT purchased $250.43 worth of merchandise from Target, 999 W. Main Street, Dundee, Illinois by submitting false identification in the name of Lashanda Posey, 118 Medical Drive, Carmel, Indiana

and paying with a fraudulent check. The check was fraudulent in that the bank routing number was accurate but the checking account number was not a real account.

C. On or about August 4, 2000, ROBIN HATCHETT purchased $226.59 worth of merchandise from Target, 6601 W. Grand Avenue, Gurnee, Illinois by submitting false identification in the name of Ellen Carwell, 6646 North 77th Street, Milwaukee, Wisconsin and paying with a fraudulent check. The check was fraudulent in that the bank routing number was accurate but the checking account number was not a real account.

D. On or about November 5, 2001, ROBIN HATCHETT purchased $181.86 worth of merchandise from Marshall Fields, 1 River Oaks Dr., Calumet City, Illinois by submitting false identification in the name of Bari Blumenthal, 3004 West Bay Villa Avenue, Tampa, Florida and paying with a fraudulent check. The check was fraudulent in that the bank routing number was accurate but the checking account number was not a real account.

E. On or about November 5, 2001, ROBIN HATCHETT purchased $146.14 worth of merchandise from Marshall Fields, 1 River Oaks Dr., Calumet City, Illinois by submitting false identification in the name of Bari Blumenthal, 3004 West Bay Villa Avenue, Tampa, Florida and paying with a fraudulent check. The check was fraudulent in that the bank routing number was accurate but the checking account number was not a real account..

18. According to Kylee Evans, from approximately September 11, 1999 until and including February 4, 2002, ROBIN HATCHETT has purchased over $9,000 worth of merchandise from Marshall Fields stores in five (5) states, including Illinois,

using false names, identifications, and paying with fraudulent checks in that the bank routing number was accurate but the checking account number was not a real account.

19. According to company records, Telecheck and Certegy have paid over $ 41,000 due to fraudulent checks written by ROBIN HATCHETT using false names, identifications, and paying with fraudulent checks in that the bank routing number was accurate but the checking account number was not a real account.

20. According to Kylee Evans, GENELL LONIE purchased merchandise at the following stores using the following false names and addresses:

A. On or about October 4, 1999, GENELL LONIE purchased $236.91 worth of merchandise from Target, 2701 Route 30/Plainfield Road, Joliet, Illinois by submitting false identification in the name of Ariel Schubert, 151 Mason Road, Cincinnati, Ohio and paying by a fraudulent check. The check was fraudulent in that the bank routing number was accurate but the checking account number was not a real account.

B. On or about October 19, 1999, GENELL LONIE purchased $240.99 worth of merchandise from Target, 6601 W. Grand Avenue, Gurnee, Illinois by submitting false identification in the name of Kristen Curnyn, 145 Mason Road, Cincinnati, Ohio and paying with a fraudulent check. The check was fraudulent in that the bank routing number was accurate but the checking account number was not a real account.

C. On or about November 24, 1999, GENELL LONIE purchased $329.04 worth of merchandise from Target, 2621 W. Schaumburg, Schaumburg, Illinois by submitting false identification in the name of Lee Jorgensen, 6942 Lexington Avenue, St. Louis, Missouri and paying with a fraudulent check. The check was fraudulent in that the

bank routing number was accurate but the checking account number was not a real account.

D. On or about December 2, 1999, GENELL LONIE purchased $291.13 worth of merchandise from Target in 2621 W. Schaumburg, Schaumburg, Illinois by submitting false identification in the name of Stacey Gant, 6958 Lexington Avenue, St. Louis, Missouri and paying with a fraudulent check. The check was fraudulent in that the bank routing number was accurate but the checking account number was not a real account.

E. On or about September 19, 2000, GENELL LONIE purchased $219.30 worth of merchandise from Marshall Field's, 1 Fox Valley Center, Aurora, Illinois by submitting false identification in the name of Stephanie Blackburn, 219 East 11th Street, Michigan City, Indiana and paying with a fraudulent check. The check was fraudulent in that the bank routing number was accurate but the checking account number was not a real account.

21. According to Kylee Evans, from approximately August 9, 1998 until and including March 11, 2002, GENELL LONIE has purchased over $27,000 worth of merchandise from Marshall Fields and Target stores in six (6) states, including Illinois, using false names, identifications, and paying with fraudulent checks in that the bank routing number was accurate but the checking account number was not a real account.

22. According to company records, Telecheck and Certegy have paid over $121,000 due to fraudulent checks written by GENELL LONIE using false names,

identifications, and _ ying with fraudulent checks in that th ank routing number was accurate but the checking account number was not a real account.

23. According to Kylee Evans "JANE DOE" purchased merchandise at the following store using the following names and addresses:

A. On or about September 17, 1999, "JANE DOE" purchased $140.06 worth of merchandise from Target, 15850 S. 94th Avenue, Orland Park, Illinois by submitting false identification in the name of Sharine Moats, 6462 Breamore Road, Indianapolis, Indiana and paying with a fraudulent check. The check was fraudulent in that the bank routing number was accurate but the checking account number was not a real account.

B . On or about October 4, 1999, "JANE DOE" purchased $172.39 worth of merchandise from Target, 2701 Rte 30/Plainfield Rd, Joliet, Illinois by submitting false identification in the name of Sharine Moats, 4452 Sycamore Road, Cincinnati, Ohio and paying with a fraudulent check. The check was fraudulent in that the bank routing number was accurate but the checking account number was not a real account.

C. On or about January 31, 2001, "JANE DOE" purchased $97.87 worth of merchandise from Marshall Field's, 111 N. State Street, Chicago, Illinois by submitting false identification in the name of Sanquenette McCarter, 709 Teakwood Avenue, Tampa, Florida and paying with a fraudulent check. The check was fraudulent in that the bank routing number was accurate but the checking account number was not a real account.

D. On or about May 1, 2001, "JANE DOE" purchased $191.40 worth of merchandise from Marshall Field's, 111 N. State Street, Chicago, Illinois by submitting

false identification the name of Karen Roper, 409 Ca on Circle, Chattanooga, Tennessee and paying with a fraudulent check. The check was fraudulent in that the bank routing number was accurate but the checking account number was not a real account.

24. According to Kylee Evans, from approximately March 20, 1999 until and including October 25, 2001, "JANE DOE" has purchased over $3,800 worth of merchandise from Marshall Fields and Target stores in six (6) states, including Illinois, using false names, identifications, and paying with fraudulent checks in that the bank routing number was accurate but the checking account number was not a real account.

25. According to company records, Telecheck and Certegy have paid over $22,000 due to fraudulent checks written by "JANE DOE" using false names, identifications, and paying with fraudulent checks in that the bank routing number was accurate but the checking account number was not a real account.

26. According to Kylee Evans, who reviewed company records, on or about September 28, 2001, BELINDA JOHNSON purchased $279.03 worth of merchandise from Target in Brandon, Florida by submitting false identification in the name of Karin Hardin, 6800 Park Street South, Palm Harbor, Florida and paying with a fraudulent check. The check was fraudulent in that the bank routing number was accurate but the checking account number was not a real account.

27. According to Kylee Evans, who reviewed company records, on or about September 9, 2000, BELINDA JOHNSON purchased $243.47 worth of merchandise from Target, in Melrose Park, Illinois by submitting false identification in the name of Maria Buitron, 3250 N. 46th Street, Milwaukee, Wisconsin and paying with a fraudulent check.

Also according to Kylee Evans, September 22, 2001, BELINDA JOHNSON purchased $275.39 worth of merchandise from Target, in Tampa, Florida by submitting false identification in the name of Maria Buitron, 3250 N. 46th Street, Milwaukee, Wisconsin and paying with a fraudulent check. The checks were fraudulent in that the bank routing numbers was accurate but the checking account numbers were not real accounts.

28. On May 22, 2002, law enforcement followed ROBIN HATCHETT and SHIKILA BLOUNT as they departed 728 W. 138th Street, Riverdale, IL. and traveled to various retail stores in Michigan City, IN. Specifically, HATCHETT and BLOUNT traveled to Tommy Hilfiger, Lighthouse Mall, 1303 Lighthouse Place, Michigan City, IN 46360; King Richards Liquor Store, 3231 South Franklin, Michigan City, IN 46360; Office Max, 4421 South Franklin, Michigan City, IN 46360. At those stores, HATCHETT and BLOUNT fraudulently purchased merchandise. According to employees of the stores and a review of the checks and identifications presented by law enforcement, ROBIN HATCHETT passed three checks using the name Cyana Jones with an Indiana Driver's License. I ran the name thru an Indiana license database and the identification number on the license does not exist. HATCHETT and BLOUNT returned to 728 W. 138th Street, Riverdale, IL. after they made the purchases.

29. According to Kylee Evans and sources at Certegy and Telecheck, the subjects identified in this affidavit are responsible for approximately $600,000 in loss nationwide and have used over 100 different names and addresses.

12

## THE SUBJECT PREMISES

30. I and other law enforcement personnel have observed BELINDA JOHNSON and SHIKILA BLOUNT (JOHNSON's daughter) at 728 W. 138th Street, First Floor, Riverdale, IL., on numerous occasions between April 17, 2002 and August 30, 2002. According to Comed Electric, Co. and SBC Ameritech, BELINDA JOHNSON is listed on the service bill at this address. According to Comed Electric, Co. and SBC Ameritech, Erica Buie is listed on the service bill at 705 East 78th Street, #2W, Chicago, IL. According to Kylee Evans, Erica Buie is an alias used by GENELL LONIE is connection with this scheme. According to law enforcement, ROBIN HATCHETT has been seen on numerous occasions in September 2002 at 8552 South Kingston, Chicago, IL. According to officials at the United States Post Office, the above individuals receive mail at the above respective addresses.

31. On April 17, 2002 and April 23, 2002, I and other law enforcement personnel have observed an unidentified female suspect known herein as "JANE DOE" enter 728 W. 138th Street, Second Floor, Riverdale, IL. I have reviewed the Driver's License pictures presented to the stores listed in Paragraphs 23A to D in this affidavit. The pictures are that of "JANE DOE." According to the United States Postal Service, Belinda Holmes and Claudia Johnson receive mail at 728 W. 138th Street, Second Floor, Riverdale, IL. According to Kylee Evans, Belinda Holmes is an alias used by BELINDA JOHNSON in connection with this scheme. According to law enforcement authorities, BELINDA JOHNSON was arrested in Indiana in 1993 under the alias of Belinda Holmes. For these reasons, law enforcement believes that "JANE DOE" is involved in the scheme described

13

in this affidavit and that 728 W. 138th Street, Second Flo Riverdale, IL. contains relevant evidence of this scheme.

32. On April 4, 2002 law enforcement pulled trash from 9536 S. Bishop, Chicago, IL. Based upon law enforcement surveillance and information from the U.S. Postal Service , BELINDA JOHNSON lived at this address on April 4, 2002. As a result of the trash-pull, law enforcement recovered a genuine Target instant credit card in the name of Karin Hardin & genuine JC Penny temporary charge card in the name of Karin Hardin (see Paragraph 26 in this affidavit). Additionally, law enforcement recovered twelve (12) counterfeit personal checks under the name Maria Buitron.

33. Based upon my knowledge, training, and experience, and the experience of other law enforcement personnel with whom I have spoken, I am aware that perpetrators of this type of crime commonly maintain identification documents, counterfeit checks, fraudulently obtained merchandise, and computers and/or documents which contain records of possible victims or suspects in their home. Additionally, the fact that evidence was obtained from the trash at 9536 S. Bishop, Chicago, IL. and that HATCHETT and BLOUNT traveled from 728 W. 138th Street, Riverdale, IL. to retail stores where the fraudulently obtained merchandise and then returned to that house, indicates that these suspects maintain relevant evidence at their homes. Finally based upon a review of fraudulent checks and identifications presented to various retail stores, the suspects identified in this affidavit are a part of the same organized group as they fraudulently obtained merchandise using some of the same aliases and addresses.

### COMPUTERS

34. Based upon my knowledge, training, and experience, I know that in order to completely and accurately retrieve data maintained in computer hardware or on computer software, to ensure accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that some computer equipment, peripherals, related instructions in the form of manuals and notes, as well as the software utilized to operate such a computer, be seized and subsequently processed by a qualified computer specialist in a laboratory setting. This is true because of the following:

A. Computer storage devices (such as hard disks, diskettes, tapes, laser disks, Bernoulli drives, etc.) can store the equivalent of thousands of pages of information. Additionally, a user may seek to conceal criminal evidence by storing it in random order with deceptive file names. Searching authorities are thus required to examine all the stored data to determine which particular files are evidence or instrumentalities of criminal activity. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data analysis on-site.

B. Analyzing computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. Thus it is difficult to know prior to the search which expert possesses sufficient specialized skills to best analyze the system and its data. No matter which system is used, however, data analysis protocols are exacting scientific

15

procedures, designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (both from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

C.  Due to the volume of the data at issue and the technical requirements set forth above, it may be necessary that the above-referenced equipment, software, data, and related instructions be seized and subsequently processed by a qualified computer specialist in a laboratory setting.  Under appropriate circumstances, some types of computer equipment can be more readily analyzed and pertinent data seized on-site, thus eliminating the need for its removal from the premises.  One factor used in determining whether to analyze a computer on-site or to remove it from the premises is whether the computer constitutes an instrumentality of an offense and is thus subject to immediate seizure as such—or whether it serves as a mere repository for evidence of a criminal offense.  Another determining factor is whether, as a repository for evidence, a particular device can be more readily, quickly, and thus less intrusively analyzed off site, with due consideration given to preserving the integrity of the evidence.  This, in turn, is often dependent upon the amount of data and number of discrete files or file areas that must be analyzed, and this is frequently dependent upon the particular type of computer hardware involved.  As a result, it is ordinarily impossible to appropriately analyze such material without removing it from the location where it is seized.

D. Based upon my knowledge, training, and experience, and the experience of other law enforcement personnel with whom I have spoken, I am aware that searches and seizures of evidence from computers taken from the subject premises commonly require agents to seize most or all of a computer system's input/output peripheral devices, in order for a qualified computer expert to accurately retrieve the system's data in a laboratory or other controlled environment. Therefore, in those instances where computers are removed from the subject premises, and in order to fully retrieve data from a computer system, investigators must seize all magnetic storage devices as well as the central processing units (CPUs) and applicable keyboards and monitors which are an integral part of the processing unit. If, after inspecting the input/output devices, system software, and pertinent computer-related documentation it becomes apparent that these items are no longer necessary to retrieve and preserve the data evidence, such materials and/or equipment will be returned within a reasonable time.

<u>ANALYSIS OF ELECTRONIC DATA</u>

35. The analysis of electronically stored data, whether performed on site or in a laboratory or other controlled environment, may entail any or all of several different techniques. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer capable of containing pertinent files, in order to locate the evidence and instrumentalities authorized for seizure by the warrant); "opening" or reading the first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover

recently deleted data, scanning storage areas for deliberately ..den files; and performing electronic "key-word" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

## CONCLUSION

36.     Based upon the information outlined above, I submit that there is probable cause to believe that the houses at 728 W. 138th Street, Riverdale, IL., 705 East 78th Street, Apt. 2W, Chicago, IL, and 8552 S. Kingston, Chicago, IL. contain evidence of violation of Title 18, United States Code, Section 1029.

37.     Law enforcement has been to 728 W. 138th Street, Riverdale, IL., 705 East 78th Street, Apt. 2W, Chicago, IL, and 8552 S. Kingston, Chicago, IL. on numerous occasions.  The descriptions of these addresses is included in Attachment B.

38. The foregoing summary of certain facts is submitted for the limited purpose of establishing probable cause in connection with the attached complaint and application for search warrant.  I have set forth only those facts that I believe are necessary to establish probable cause in this matter.  This is not a complete statement of all I know about the events described in this affidavit.

FUR＿＿ER AFFIANT SAYETH NOT.

Scott A. Heston
Special Agent, Secret Service


SUBSCRIBED and SWORN TO before me this
___ day of October 2002

ARLANDER KEYS
UNITED STATES CHIEF MAGISTRATE JUDGE

19

Attachment A
ITEMS TO BE SEIZED

Evidence of violation of 18 U.S.C. §1029, including but not limited to:

1.  Any and all checks, as well as any and all documents and records which refer or relate to checking and/or investment accounts in any name, including credit card receipts, applications, statements, correspondence from or to issuers of the checks.

2.  Any and all telephone records.

3.  Any and all identification documents, including but not limited to driver's licenses, state identification cards, employee identification, and passports.

4.  Any and all journals, address books, rolodex records, and any other compilation of possible victims or suspects.

5.  Any and all merchandise contained in original packaging, bearing sales tags, or otherwise appearing to have been obtained through the fraudulent use of checks, including but not limited to: Televisions, video recorders, radios, video and stereo equipment, telephones, computers and computer hardware, clothes, watches or other jewelry.

6.  Any and all computer hardware, software, documentation, passwords and data security as described below:

    a)  Hardware – computer hardware consists of any and all computer equipment capable of being linked together in a local area network (LAN) including all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes, but is not limited to, any data processing devices such as central processing units, self contained "laptop" or "notebook" computers, internal and peripheral storage devices such as fixed external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices or other memory storage devices; peripheral input/output devices such as keyboards, printers, and video display monitors, related communication devices such as modems, cables and connections as well as any devices, mechanisms or parts that can be used to restrict access to computer hardware such as physical keys and locks.

b)   Softw.   – any digital information which can l.   nterpreted by a computer and any related components to direct the way a computer works stored in electronic, magnetic, optical, or digital form, including programs to run operating systems, applications (like word processing or graphics), utilities, compilers, interpreters and communications programs.

c)   Documentation – computer related documentation including written, recorded, printed, or electronically stored material, which explains or illustrates how to configure or use computer hardware, software, or other related items.

d)   Electronically stored data – any and all such data concerning counterfeit U.S. currency and any and all such data consisting of information stored on back-up tapes, computer hard drives and/or any other form or manner.

e)   Passwords and data security – computer passwords and other data security devices designed to restrict access to or hide computer software, documentation, or data, including hardware, software, or other programming codes.

Attachment B
## PREMISES TO BE SEARCHED

**1) 728 West 138th Street, Riverdale, IL.**

This is a 2 story tan house with vinyl siding and an attached garage. The garage is located on the corner of 138th street and South Emerald Avenue. 138th is an east-west street & Emerald is a north-south street. The north side of the house faces 138th street. The number 728 is to the right of the front door and above a mailbox if you are facing south and looking at the front of the house. The attached garage has 2 vehicle garage doors facing south and an access door facing west. One set of steps has approximately 6 wooden steps on the southwest side of the house leading to the first floor apartment of the house. A second set of steps has approximately 10 wooden steps on the southeast side of the house leading to the second floor apartment of the house. There is also a basement in the house.

**2)    8552 S. Kingston, Chicago, IL**

This is a 2 story residential house with pinkish colored siding covering the entire house, brown trim work and a black asphalt roof. The front of this residence faces an easterly direction towards Kingston Avenue and approximately 1 house north of the intersection of Kingston Avenue and East 86th Street. The main entrance is on the north side of the house as you face the house and enters out onto South Kingston. There is a small shingled overhang above the door and approximately 6 steps leading up to the door. To the left of

the main entrance do   is a mailbox and above the mailbox is a  ooden placard with the number "8552" inscribed into the wood.

### 3) 705 East 78th Street, Chicago, IL.

This is 3 story red brick apartment building located at the intersection of South Langley Avenue and East 78th Street.  The main entrance is accessed from East 78th Street and the number "705" is marked on the front door in gold coloring.  There is a fenced and gated pedestrian alley on the rear side of the building that can be accessed from either South Langley Avenue or from the vehicular alley accessed from East 78th Street.  There is a center staircase access midway through the alley.